

1   HENRY R. HU (California Bar No.: 164165)
2   520 S. El Camino Real, Suite 510
    San Mateo, CA 94402
3   Telephone: (650) 685-8189
    Fax: (650) 685-8190
4   Email: lawbenryhu@gmail.com
5   Attorney for Self and Co-Plaintiff – STEPHANIE F. HU

6

7                           E-filing

8

9

10              UNITED STATES DISTRICT COURT              SC

11             NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION     2588

13

| | |
|---|---|
| 14  **HENRY R. HU AND STEPHANIE F. HU** ) | **CIVIL ACTION NO:** |
| 15                 **Plaintiffs,** ) | **COMPLAINT FOR VIOLATIONS OF** |
| 16                    **V.** ) | **FEDERAL SECURITIES LAW** |
| 17 ) | Securities Exchange Act of 1934: Sec. 10(b), |
| 18  **LANEY LEE, JASON WANG,** ) | 15 U.S.C. 78j(b); Rule l0b-5, 17 C.F.R. Sec. |
| 19  **STEWARD WANG, ANITA BEI HUANG,** ) | 240.10b-5, and Sec. 15(a) , 15 U.S.C. 78o(a). |
| 20  **JERRY HUANG, EDWARD WONG,** ) | Securities Act of 1933: Sec. 17(a) , 15 U.S.C. |
| 21  **KING MARK,  I-95 MALL OF ASIA** ) | § 77q(a); Secs. 5(a) and 5(c), 15 U.S.C. 77e(a) and |
| 22  **INC.** ) | 77e(c).  Secs. 5(a) and 5(c), 15 U.S.C.  77e(a) and |
| 23  **Defendants.** ) | 77e(c). |
| 24 ) | **JURY TRIAL DEMANDED** |

25

26

27

28

29

1

## JURISDICTION AND VENUE

2    1.    This Court has jurisdiction over this action pursuant to Sections 22(a) of the Securities Act of

3    1933 ("Securities Act"), 15 U.S.C. §77v(a), and Section 27 of the Securities Exchange Act of 1934

4    ("Exchange Act"), 15 U.S.C. 78aa.  Defendants have, directly or indirectly, made use of the means or

5    instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange

6    in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

7    2.    Venue  is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a),

8    and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices, and

9    courses of conduct constituting violations of the federal securities laws occurred within this district,

10   and some of the defendants reside or are located in this district.

11

## SUMMARY

12   3.    This case involves the fraudulent offer and sale of 500,000 in unregistered securities (shares

13   of stock) of I-95 Mall of Asia, Inc. in Baltimore, Maryland ("I-95"), controlled by Laney Lee ("Laney"),

14   Jason Wang, a.k.a. Jason C.H. Wang ("Jason"), Steward Wang ("Steward"), Anita Bei Huang,

15   a.k.a Anita Huang ("Anita"), Jerry Huang ("Jerry"), King Mark ("King"), Edward Wong

16   ("Edward") (collectively "Defendants').

17   4.    Since at least 2005 through present, Defendants have been knowingly, jointly, willfully,

18   directly and indirectly soliciting and deceiving investors for multi-level marketing and

19   investment schemes operated from an office located at 5602 Baltimore National Pike, Suite 700,

20   Baltimore, Maryland 21228.  Defendants have been operating an elaborate and widespread

21   marketing scheme in the name of I-95's commercial real estate development and international

22   business operations. The schemes involve actively presenting false and untrue oral and written

23   statements about I-95's financial conditions, deceiving and soliciting Plaintiffs – Henry R. Hu

24   ("Plaintiff-H) and his wife Stephanie F. Hu ("Plaintiff-S") and other investors with promises of financial

25   rewards, and selling registered securities for millions of dollars for their personal gains. Defendants, in

26   association with other associated entities and individuals, held investment presentations with false

27

28

29

statements and material misrepresentations in the promotion and sale of I-95 securities (i.e. shares of stock) which have neither been registered nor exempt under the state and federal securities laws.

5.    In late 2005, Defendants aggressively and successfully solicited Plaintiffs and other investors in the San Francisco Bay Area and other locations with oral and written representations about I-95 assets and financial conditions as well as business prospects.

6.    In promoting the schemes, Defendants have lied about I-95 financial conditions by falsely claiming, especially in the I-95 Stock Purchase Agreement that I-95 owned such assets and properties as, among other things, 140 acres land of commercial use, 250,000 square feet land of steel-made, brand new, ready for use commercial building, and 350,000 square feet land of warehousing and logistic use in the State of Maryland, with the total appraised assets (visible and invisible) of $100 million.

7.    Relying on Defendants' oral and written representations, especially the written statements in the Stock Purchase Agreement, Plaintiffs purchased a total of 500,000 shares of stock for $250,000 which were wire-transferred from Plaintiffs to Defendants' I-95 account according to their instructions on December 2, 2005.

8.    On December 7, 2005, Plaintiffs received the two I-95 Stock Certificates from Defendants. Plaintiffs were instructed to contact Anita for all the developments of the company as she was the one who "introduced" us to Laney and I-95.

9.    In 2006 and 2007, Defendants continued to conceal the real financial status of I-95 and to provide false information to Plaintiffs and other investors. Defendants announced in 2007 that I-95 was selling its developed commercial units in the Mall of Asia for $600,000-700,000 per unit. They claimed that many of the units had already been sold or booked by the investors. During that period, Defendants claimed that I-95 was developing successfully and reassuring Plaintiffs that their investment was a good one. Defendants also referred Plaintiffs to the I-95 and other related websites for the developments.

10.    From 2005 to present, Defendants have presented material false and misleading information on I-95 website and other websites of the companies associated with Defendants. They posted many photos showing Laney and Jason posed with government leaders from Bush

Administration and Maryland State government, claiming that I-95 programs were endorsed and supported by the state and federal government. Their real intent has been to attract more investors into their fraudulent schemes.

11.     In early November 2007, Plaintiff had lost contact with Anita. In the following months, Plaintiff-H began to contact other Defendants including Edward, Jerry and Jason by phone and emails. They all painted a rosy picture about I-95's business and financial conditions. To understand I-95's real situation, Plaintiff-H began requesting company federal income tax returns. Defendants delayed by initially claiming that the tax documents were either confidential or not prepared yet by their accountants.

12.     In September 2008, after Plaintiffs' repeated adamant requests, Defendants reluctantly faxed I-95's 2005 and 2006 corporate federal tax returns to Plaintiffs on September 26, 2008.  To Plaintiffs' surprise, these two tax returns revealed for the first time that I-95's assets only consists of investor's cash with I-95 office equipment rather than the claimed sizable land and buildings I-95 purportedly owned as stated in the Stock Purchase Agreement.

13.     In November 2008, Plaintiff-H flew to Maryland to investigate the matter and confronted Jason and Edward, finding out that I-95 had never owned any such real properties as listed in its Stock Purchase Agreement.  At that point, Plaintiffs found themselves be deceived and defrauded by Defendants into purchasing I-95 securities.

14.     Plaintiffs' findings have been further confirmed by I-95's 2007 federal tax returns faxed by Defendants to Plaintiffs on March 9, 2009.  These tax returns again confirmed Plaintiffs' findings, and also revealed that the cash investment by Plaintiffs and other investors have been fast diminishing at the manipulations by the controlling Defendants for their personal use in the names of salaries, commissions, loans, bonus and expenses, or for use by other entities they control both in the United States and China.

15.     The Defendants, by engaging in the conduct described in this complaint, have flagrantly violated, and unless enjoined will continue to violate, the registration, antifraud, and broker-dealer registration provisions of the federal securities laws. By this complaint, Plaintiffs seeks relief against Defendants,

including a temporary restraining order, an asset freeze, the appointment of a receiver, accountings,
an order expediting discovery, and an order prohibiting the destruction of documents, as well as
preliminary and permanent injunctions, disgorgement with prejudgment interest, repayment of
invested money plus prejudgment interest, and civil penalties.

## PLAINTIFFS

16.     Plaintiffs, husband and wife, are long-term residents in the San Mateo county
of California. Plaintiff – Henry R. Hu ("Henry") has been a busy immigration law
practitioner while Plaintiff – Stephanie F. Hu ("Stephanie") has been a legal assistant
and housewife.  Both had little investment experience prior to knowing Defendants.

## DEFENDANTS

17.     I-95 was incorporated by Jason in Maryland in June 2004.  I-95 has been located 5602
Baltimore National Pike, Suite 700, Baltimore, ML 21228, since its incorporation.  At the
control and manipulation by Defendants, I-95 has sold to Plaintiffs and other investors numerous
unregistered share of stocks worth millions of dollars.

18.     Jason, resides at 3986 Top View Road, Ellicott, MD 21042, and is I-95's resident agent and
one of its initial three initial directors.  The other two are King Mark and Joe Chen as shown in I-95 Articles
of Incorporation.  As shown in I-95's By-Laws, Jason is Chairman of the Board of Directors.  Jason and his
wife are the behind-the-scene mastermind of the investment schemes defrauding Plaintiffs and other
investors.

19.     Laney, wife of Jason, resides at  3986 Top View Road, Ellicott, MD 21042, and is I-95's
Director, Chief  Executive Officer and President as shown in I-95 By-Laws.. Laney signed I-95
Stock Purchase Agreement and the Stock Certificates issued to Plaintiffs.  Laney and her husband
and other I-95 top executives are the behind-the-scene mastermind of the investment schemes defrauding
Plaintiffs and other investors.

1  20.     Anita, resides at 700 Mesa Circle, Hayward, CA 94541, and was recruited by Jason and

2  Laney in 2005 as I-95 Director and Designated Assistant to President. From at least 2005

3  through 2007, together with Jerry, Anita had personally solicited Plaintiffs and other investors in

4  California through investment presentations and personal meetings. Anita is not registered under

5  the securities law or with the Security and Exchange Commission in any capacity. Anita actively

6  assisted and joined Laney and Jason in implementing their fraudulent schemes deceiving

7  investors.

8  21.     Jerry, whose residence is unknown to Plaintiffs, has his business address at 5602

9  Baltimore National Pike, Suite 700, Baltimore, ML 21228. From at least 2005 through the

10 present, Jerry has been serving as I-95 Director of Sales and Marketing and, in association with

11 Anita, had personally solicited Plaintiffs and other investors in various locations including Northern

12 California through investment presentations and meetings. Jerry is not registered under the

13 securities law or with the Security and Exchange Commission in any capacity.

14 **22.**     Steward, married son of Jason Wang and Laney Lee, resides at some unknown address in

15 California, is I-95's Director of Sales and Marketing . From at least 2005 through the present,

16 according to Jason, Steward joined his parents and employed his internet development skills and

17 knowledge in soliciting Plaintiffs and other investors through I-95 and its affiliated companies' websites.

18 Steward has been developing, updating and maintaining these websites with the intent to lure more investors to

19 buy securities of I-95 and its affiliated companies.  Steward is not registered under the securities law or

20 with the Security and Exchange Commission in any capacity.

21 23.     King,  whose residence is unknown to Plaintiffs, has his business address at 5602

22 Baltimore National Pike, Suite 700, Baltimore, ML 21228. From at least 2004 through the

23 present, King has been serving as I-95 Director and, in association with other Defendants, had

24 planned I-95 schemes in soliciting Plaintiffs and other investors for their investment in I-95. King is

25 not registered under the securities law or with the Security and Exchange Commission in any

26 capacity.

27

28

29

24.     Edward, whose residence is unknown to Plaintiffs, has his business address at 5602 Baltimore National Pike, Suite 700, Baltimore, ML 21228. From at least 2005 through the present, Edward has been serving as I-95 Director of Administration and, in association with other Defendants, had planned and implemented I-95 schemes in soliciting and deceiving Plaintiffs and other investors for their investment in I-95. Edward is not registered under the securities law or with the Security and Exchange Commission in any capacity.

## THE FRAUDULENT OFFERING WITH INTENT TO DECEIVE

25.     Since at least 2005, Defendants have been knowingly, willfully, jointly, directly and indirectly soliciting and deceiving Plaintiffs and other investors in a multi-level marketing scheme in California and elsewhere, including Plaintiffs' residence and business in Hillsborough and San Mateo respectively. Defendants offered and sold unregistered securities to Plaintiffs and other investors in California. Defendants also offered and sold the securities through I-95 website and its affiliated websites. Defendants conspired, designed, prepared and presented the Stock Purchase Agreement and other promotion materials with material false and untrue statements regarding I-95 financial conditions with the malicious intent to deceive and defraud investors from the beginning of the I-95 schemes. No registration statement was filed or in effect with respect to any of the Defendants' securities offerings.

26.     Plaintiffs did not have any knowledge of or any relationships or dealings with I-95 prior to Anita's marketing solicitation of Plaintiffs in October 2005.

27.     Anita, a divorced woman, used to be a salesperson at Nieman Marcus in San Francisco where Plaintiff-S first met and knew her during her shopping there. In or about 2005, Anita was recruited by I-95 executives including Laney and Jason for marketing I-95 investment projects.

28.     During her chance meeting with Plaintiff-S in Burlingame shopping district in early October 2005, Anita indicated that she had been appointed by Laney and Jason to be their specially designated Assistant and Director of I-95, responsible for marketing I-95 investment

1   projects in California. Anita then briefly described the projects to Plaintiff-S, and requested
2   personal meetings with Plaintiff-H.

3   29.     Anita then called Plaintiff-H and asking for a meeting in latter's office in San Mateo for
4   the I-95 project introduction. One day in Mid-October 2005, Anita and Jerry came to Plaintiff's
5   San Mateo office and jointly promoting I-95 commercial real estate and business program to
6   Plaintiffs. Jerry introduced himself as I-95 Director of Sales and Marketing which Anita
7   confirmed her appointment by as Laney's special assistant and I-95 Director.

8   30.     Anita showed Plaintiffs I-95 marketing brochure with her business card, claiming that I-
9   95 was a financially solid company in Maryland with ownership of vast land and commercial
10  properties she has personally visited. Anita and Jerry claimed that Jason and Laney had wide
11  close relationships with the White House and local state government in the East Coast which
12  fully supported I-95 project. Anita and Jerry told Plaintiffs that I-95 project was ready to take
13  off soon with its enormous assets and strong government support.

14  31.     Anita and Jerry further told Plaintiffs that all the initial investment would be repaid in
15  about two years with double or triple returns when I-95 started selling its completed commercial
16  properties in the I-95 Mall of Asia. Anita and Jerry further noted that Plaintiffs could transfer
17  their shares of stocks after I-95 was listed on the New York stock exchange. Anita and Jerry
18  further noted that the initial stock offerings were only limited to their inner circle friends and
19  acquaintances, and only those qualified would be accepted by Laney and Jason. Anita and Jerry
20  then answered Plaintiffs' questions about the project and procedures.

21  32.     In the following weeks, Anita made many follow-up phone calls to Plaintiffs regarding
22  their investment decisions. During the phone calls, Anita would further elaborate on the I-95
23  projects while indicating a deadline in December 2005 for I-95 to accept the investment. Anita
24  then visited Plaintiff-H again in his office in early November 2005, further soliciting Plaintiffs
25  and promoting the real estate development projects while explaining to Plaintiff-H how the
26  investment would be repaid.

27
28
29

1  33.    In Mid-November 2005, Anita and Jerry both visited Plaintiffs again at their residence

2  in Hillsborough, California. Plaintiffs asked some more detailed questions about the safety of

3  the investment and procedures involved. Both of them further assured Plaintiffs that the

4  investment in I-95 Mall of Asia would be guaranteed by its vast land and commercial

5  properties in Maryland with federal and state government support, and that I-95 financial

6  situation would be confirmed in writing in the Stock Purchase Agreement to be signed by

7  Laney. They further affirmed that the projects led by Laney and Jason were strongly

8  supported by the White House Minority Business Committee and the governor's office of

9  Maryland, and that they had vast personal and business connections and expertise in the

10  projects. Anita and Jerry further told Plaintiffs that they had personally seen and verified the

11  land and real properties of the company, and the company's investment program was

12  approved and supported by the federal and state government. They further solicited and

13  encouraged Plaintiffs to invest by claiming that they both had also invested in I-95. Anita

14  claimed that "the investment in I-95 is far better and safer than purchasing Google stocks."

15  34.    Relying on Anita and Jerry's solicitation and representations, Plaintiffs became interested in the

16  I-95 project by asking for the formal investment documents for review. On or about November 18,

17  2005, Anita personally delivered a copy of I-95 Stock Purchase Agreement with Confidentiality

18  Agreement to Plaintiffs' office in San Mateo. Anita also instructed Plaintiffs about the signing

19  and fund wiring requirements. The Stock Purchase Agreement expressly stated that I-95 as Party

20  A "owns the assets and properties as follows:

21      a. The investment and development business operation plan of 1-95 Mall of Asia project

22      b. A professional working team of 5-year experience of related project

23      c. Multi-dimensional network of infrastructures and facilities to accommodate for 1-95 Mall

24          of Asia project

25      d. 140 acres land of commercial use, located at exit 109, Cecil County of Maryland (adjacent

26          to Interstate 95)

27

28

29

Complaint for Violations of Federal Securities Law                    Page  9  of  19

1    e. 250,000 sq. ft. land of steel-made, brand new, ready for use commercial building,

2        located at exit 109, Cecil County of Maryland (adjacent to Interstate 95)

3    f. 350,000 sq. ft. land of warehousing and logistics use, located at exit 100, Cecil County of

4        Maryland (adjacent to Interstate 95)

5    g. One Maryland Tax Credit and Maryland Job Creation Income Tax Credit Program

6    h. MAAPDOC Commercial Condominium Unit Purchase Agreements

7    i. MAAPDOC Sales Agencies in Asia

8    j. I-95 MALL OF ASIA comprehensive, favorable public relations and established

9        reputation

10    k. Other invisible commercial assets".

11 The Stock Purchase Agreement further stated: "As of August 31, 2005, the total appraised

12 assets (visible and invisible) of Party A is USD 100,000,000.00".

13 35.    With total reliance on Defendants' written and oral representations of I-95's financial and

14 asset conditions,  Plaintiffs decided to invest their $250,000 savings and signed the Stock

15 Purchase Agreement and the Confidential Agreement before the local notaries public on

16 November 21, 2005.

17 36.    After signing, Plaintiffs mailed the two signed Agreements back to Laney Lee at the I-95

18 company address according to the written instructions given by Anita.

19 37.    By the end of November 2005, as soon as Plaintiffs returned home after Thanksgiving

20 Holidays, Anita called again and urged Plaintiffs to wire $250,000 to I-95 without delay.  Anita

21 told Plaintiffs that the investment deadline was fast approaching.

22 38.    On December 2, 2005, according to Defendants' wire instructions, Plaintiffs sent a total

23 of $250,000 by two wire transfers, i.e. $150,000 from Countrywide account on

24 December 2, 2005 and $100,000 from American Savings account.

25

26

27

28

29

1    39.    On or about December 3, 2005, I-95 received Plaintiffs' wire transfers into its bank

2    account 2000026914107 with Wachovia Bank in Baltimore, which was controlled by Laney and

3    Jason and other top officers of the company.

4    40.    On or about December 7, 2005, Anita personally delivered two I-95 stock certificates

5    (Stock Certificate No. B0026CS-001 for 250,000 shares and Certificate No. B0026CS-002 for

6    250,000 shares) to Plaintiffs in their office in San Mateo, California. The stock certificates

7    were signed by Laney with I-95 corporate secretary, issued to Plaintiffs jointly.  Anita also

8    delivered to Plaintiffs a copy of the Stock Purchase Agreement countersigned by Laney before a

9    notary public in Maryland with a copy of I-95 By-Laws. Anita then instructed Plaintiffs to sign

10   and mail back two acknowledgements of receipt of the stock certificates. Anita also reminded

11   Plaintiffs to keep confidential all their investment matters as required by I-95 executives

12   including Laney and Jason. That was Plaintiffs' last meeting with Anita.

13   41.    On December 8, 2005, Plaintiffs followed Anita's instructions and mailed back two

14   acknowledgements of receipt of the stock certificates with a cover letter addressing to Laney Lee

15   on December 8, 2005, requesting her to inform Plaintiffs of I-95's developments.

16   42.    Between 2005 to 2007, Plaintiffs called Anita several times as they were instructed to

17   contact Anita for all the developments of the company, in that Anita was the one who

18   "introduced" Plaintiffs to Laney and Jason and I-95.

19   43.    In 2006 and 2007, Defendants continued to conceal the real financial status of I-95 and

20   provide false information to Plaintiffs and other investors. In the Summer of 2007, Anita told

21   Plaintiff-H that I-95 was selling its developed commercial units in the Mall of Asia for about

22   $500,000-700,000 per unit depending on the square footage. Anita and other I-95 executives

23   such as Edward claimed that many of the units had already been sold or booked by the investors.

24   During that period, Anita would occasionally called Plaintiffs claiming that I-95 was developing

25   successfully and reassuring that Plaintiffs' investment was a good one and would repaid soon.

26

27

28

29

1    Anita and Edward also referred Plaintiffs to I-95 website and its related websites for its

2    developments and press releases, which almost always presented I-95 at its best.

3    44.      From 2005 to present, Defendants have presented material false and misleading

4    information on I-95 website and other websites of the companies associated with Defendants.

5    On June 4, 2009, Jason told Plaintiff-H that his married son Steward was specialized in internet

6    technology and has been responsible for designing, engineering and maintaining websites of I-95

7    and its associated companies based on the ideas by Jason and other executives.  Steward posted

8    many photos showing Laney and Jason posed with government leaders and politicians from

9    Bush Administration and Maryland State government, claiming that I-95 programs were

10   endorsed and supported by the state and federal government.  The defendants have been

11   consistently lying about I-95's financial conditions through Steward-engineered websites with

12   intent to lure more investors into their fraudulent schemes.

13   45.      For example,  the banner on the first page of I-95 website: www.95mallofasia.com is still

14   claiming that I-95 has "The first private own commercial property in the Nation." "The best

15   landmark on I-95 inter-state highway. Welcome all Asian enterprises to march into the first

16   largest market in the world."  Since at least 2005, Defendants, headed and consisted of Jason

17   and Laney's family, have been continuing their false claims of ownership of "first private own

18   commercial property" in the United States, with their clear and malicious intent to deceive more

19   Asian investors.

20   46.      In early 2007,  Plaintiff-H began requesting company financial statement in his email to

21   Edward and other executives.  Defendants delayed by initially claiming that the financial

22   documents were either confidential or not prepared yet by the accountant.

23   47.      In early November 2007, seeing no investment returns as promised by Defendants,

24   Plaintiffs became curious about I-95's business conditions. Plaintiff tried to contact Anita by

25   phone and email listed on her business card.  Her cell phone was disconnected.  Calls to Anita's

26

27

28

29

Complaint for Violations of Federal Securities Law                    Page  12   of   19

business phone were responded by her voice message. Emails to her were bounced or
unanswered.

48.     In November 2007, Plaintiff-H began to contact other Defendants including Edward,
Jerry and Jason by phone and emails.   On or about November 8, 2007, Plaintiff-H called Edward
who indicated that I-95 was doing well and developing into the Chinese market.  Edward also
noted that Anita has not left the company, but stationed in China responsible to developing the
market there.  Edward also told Plaintiff-H that he would be future contact for all I-95 matters
and that I-95 shareholders' meeting will be held sometime in the following year.  Edward
reassured Plaintiff-H that I-95 was running smoothly, and referred Plaintiff-H to the websites of
the company and its affiliates for latest developments.  Edward also gave Plaintiff-H Jerry's
phone number in China, and directed Plaintiff-H to call Jerry regarding I-95 business
developments in China.

49.     On or about November 10, 2007, Plaintiff-H called Jerry in China.  Jerry noted that I-95
was going into the construction materials business in China after the model of Home Depot and
that all the buildings were up there for the business,  which would produce sizable revenues in
the Summer of 2008.   Jerry then reassured Plaintiff-H that all the investors' money, including
Plaintiffs' $250,000, (minus about 10% cost) would be then paid back to I-95 investors.
Defendants' representations and their websites all painted a rosy picture about I-95's business
and financial conditions, making Plaintiffs continue to rely on their representations for the return
of the invested money.

50.     In the Summer of 2008, Plaintiff-H, seeing no shareholders meetings were held, no
money promised returned and no I-95 financial statements received, began to investigate and
understand I-95's real situation.

51.     In or about Mid-September 2008, Plaintiff-H called Edward several times inquiring about
truth of I-95's business operations. Edward indicated that King was I-95's Vice President who

1  knew all the company activities since its inception in 2004 and that King was the person to

2  contact for further inquiry on the company investment and financial conditions since 2005.

3  52.     With no response from Defendants, Plaintiff-H sent Edward the following email on

4  September 24, 2009: "Dear Edward: Since our investment in the company about three years ago

5  based on company sales representatives, we have never received any financial statement,

6  shareholder meeting notice, board meeting minutes or business reports of the company.  You

7  have noted before that you will send me the company financial statement (see your email below),

8  but so far no such document has ever been sent to me.  We have been kept in dark as to how the

9  investors' money have been used. And we would like to have a detailed accounting of how our

10  money has been used. Please also provide me with the current contact information of the

11  company management.  Thanks in advance for your response."

12  53.     On September 26, 2008, after Plaintiffs' repeated adamant requests, Edward reluctantly faxed I-

13  95's 2005 and 2006 corporate federal tax returns to Plaintiffs.  Plaintiffs learnt for the first time

14  that I-95's assets only consist of several millions of investor's money with office lease and

15  equipment rather than the claimed sizable land and buildings as well as about $100 million assets

16  I-95 purportedly owned as of 2005 as stated in the Stock Purchase Agreement.

17  **54.**     On September 26, 2008,  seeing no response from King or other executives, Plaintiff-H

18  sent Edward the following email:  "You noted that King Mark - the company VP would call me

19  by this weekend regarding the company business. However, I have not so far received any call

20  from him . Would you please ask him or any other manager in the company to call me promptly?

21  Or please give me their phone numbers so that I may call them. Thanks for your attention." No

22  call ever came from King.

23  55.     To investigate the legality and nature of the sale of securities by Defendants, Plaintiff-H

24  began legal research in the securities law. On October 3, 2008, Plaintiff-H called Mr. Brenner of

25  Maryland Securities Division whose research indicated no I-95 securities registration or

26  exemption ever filed with that Division.

27

28

29

56.     On November 3, 2008, Plaintiff-H had to put aside his busy immigration law practice and flew to Maryland to investigate the matter in person.  Plaintiff-H surveyed the area and searched county records, finding out that I-95 had never owned any such real properties as listed in its Stock Purchase Agreement.  At that point, Plaintiffs found themselves to be deceived and defrauded by Defendants into purchasing I-95 securities.

57.     On November 4, 2008, Plaintiff-H met Jason in his office who continued to describe how I-95 was in normal operations both in the Unites States and in China.  When Plaintiff-H confronted Jason with the question whether I-95 ever owned the real estate properties as represented in the Stock Purchase Agreement, Jason admitted that I-95 had to use the untrue statements in the Stock Purchase Agreement in order to raise funds and that I-95 had never owned such real estate properties since its establishment in 2004.   When Plaintiff-H indicated to Jason that his dealings were criminal, Jason replied: "Do you want to put me in jail?"   Jason then continued to reassure Plaintiff-H that I-95 business was at critical stage which was expected to turn out profits through exhibiting Chinese products in the United States in early 2009.

58.     On March 9, 2009, at Plaintiff's request, Edward faxed I-95's 2007 federal tax returns Plaintiffs' office.  These tax returns further confirmed Plaintiffs' findings and Jason's admission, and also revealed that the cash investment by Plaintiffs and other investors have been fast diminishing at the manipulations by the controlling Defendants for their personal use in the names of salaries, commissions, loans, bonus and expenses, or for use by other entities they control both in the United States and China.

59.     As a direct result of Defendants' joint fraudulent schemes with sale of I-95 shares of stock, Plaintiffs have suffered a total loss of $250,000 plus its interests as well as fees and costs in association with investigating Defendants' securities fraud, preparing and filing this complaint with the District Court.

**FIRST CLAIM FOR RELIEF**

**Fraud in The Offer or Sale of Securities**

**Violations of Section 17(a) of the Securities Act**

**(Against All Defendants)**

60.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 59 above.

61.   The Defendants, and each of them, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:

        a.    with scienter, employed devices, schemes, or artifices to defraud;

        b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

62.   By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**

**Fraud in Connection With The Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Against All Defendants)**

63.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 59 above.

64.   The Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

        a.    employed devices, schemes, or artifices to defraud;

b.      made untrue statements of a material fact or omitted to state a material fact necessary

in order to make the statements made, in the light of the circumstances under which

they were made, not misleading; or

c.      engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon other persons.

65.     By engaging in the conduct described above, the Defendants violated, and unless

restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

and Rule l0b-5 thereunder, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(Against All Defendants)**

66.     The Plaintiffs reallege and incorporate by reference paragraphs 1 through 59 above.

67.     All of the Defendants, and each of them, by engaging in the conduct described above,

directly or indirectly, made use of means or instruments of transportation or communication in interstate

commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be

carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

68.     No registration statement has been filed with the Securities and Exchange Commission or has

been in effect with respect to any of the offerings alleged herein.

69.     By engaging in the conduct described above, all of the Defendants violated, and unless restrained

and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and

77e(c).

### FOURTH CLAIM FOR RELIEF

**Failure to Register as a Broker-Dealer**

**Violations of Section 15(a) of the Exchange Act**

**(Against Alt Defendants)**

70.     The Plaintiffs reallege and incorporate by reference paragraphs 1 through 59 above.

1  71.    Defendants, and each of them, by engaging in the conduct described above, directly or

2  indirectly, made use of the mails or means or instrumentalities of interstate commerce to effect

3  transactions in, or to induce or attempt to induce, the purchase or sale of securities, without being

4  registered as brokers or dealers in accordance with Section 15(a) of the Exchange ct, IS U.S.C. § 78o(a).

5  72.    By engaging in the conduct described above, Defendants violated and unless restrained and

6  enjoined will continue to violate Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court.

#### I.

Issue findings of fact and conclusions of law that the Defendants committed the alleged
violations.

#### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure,
temporarily, preliminarily and permanently enjoining the Defendants and their officers, agents, servants,
employees, and attorneys, and those persons in active concert or participation with any of them, who
receive actual notice of the judgment by personal service or otherwise, and each of them, from violating
Sections 5(a), 5(c), and 17(a) of the Securities Act 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Sections 10(b)
and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(a), and Rule 10b-5 thereunder, 17 C.F.R. § 240.
10b-5.

#### III.

Issue, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, a temporary
restraining order and a preliminary injunction freezing the assets of each of the Defendants and any
entity affiliated with any of them, appointing a receiver over I-95 and its affiliated companies, prohibiting
each of the Defendants from destroying documents, granting expedited discovery, and requiring
accountings from each of the Defendants.

#### IV.

Order each of the Defendants to disgorge all ill-gotten gains from the Defendants' illegal

1  conduct, together with prejudgment interest thereon.

2                                          **V.**

3      Order each of the Defendants to disgorge and repay Plaintiffs' $250,000 I-95 stock purchase

4  money, together with prejudgment interest thereon.

5                                          **VI.**

6      Order each of the Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15

7  U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

8                                          **VII.**

9      Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules

10  of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be

11  entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of

   this Court

12                                         **VIII.**

13      Grant such other and further relief as this Court may determine to be just and necessary.

14

15

16  Dated: June 10, 2009

17

18                                  Respectfully submitted,

19

20                                  Henry R. Hu

21                                  Attorney at Law for Self and Co-
                                   Plaintiff - Stephanie F. Hu

22

23

24

25

26

27

28

29